UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NANCY M. LENNON,

     Plaintiff,

v.                                                                Case No. 05-73450

METROPOLITAN LIFE INSURANCE                Honorable Patrick J. Duggan
COMPANY

     Defendant,

_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on August 16, 2006.

PRESENT:       THE HONORABLE PATRICK J. DUGGAN
                U.S. DISTRICT COURT JUDGE

Nancy M. Lennon ("Plaintiff") filed this lawsuit against the Metropolitan Life

Insurance Company ("Met Life"), pursuant to the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. §§ 1001-1461, seeking personal accident insurance ("PAI")

benefits allegedly due to her as a beneficiary under her deceased son's insurance policy.

On October 20, 2003, Met Life determined that Plaintiff was not entitled to PAI

benefits, and denied Plaintiff's appeal of this decision on May 26, 2004.  Plaintiff

thereafter filed this lawsuit on September 7, 2005.  In her complaint, Plaintiff asserts a

claim alleging breach of contract based on Met Life's failure to pay her PAI benefits and

a claim requesting a declaratory judgment that she is entitled to PAI benefits.[1]  Plaintiff also brings a claim alleging that Met Life violated ERISA when it failed to provide her with a copy of the summary plan description relevant to her son's policy upon her request.

On April 28, 2006, Met Life filed a Motion to Affirm the Administrator's Decision or, in the Alternative, for Judgment on the Administrative Record.  In its Motion, Met Life seeks an order affirming its denial of Plaintiff's claim for PAI benefits.  Met Life also requests summary judgment with respect to Plaintiff's claim based on Met Life's alleged failure to provide her with a copy of the summary plan description.  On May 1, 2006, Plaintiff filed a Cross-Motion to Reverse the ERISA Plan Administrator's Decision.  Both motions have been fully briefed and now are ripe for disposition.  Having reviewed the briefs filed in support of and in opposition to these motions, the Court sees no need for oral argument, and is therefore dispensing with oral argument in accordance with Local Rule 7.1(e)(2).  For the reasons set forth below, Plaintiff's motion shall be granted and Defendant's motion shall be granted in part and denied in part.

## FACTUAL BACKGROUND

David A. Lennon, Plaintiff's son, was a salaried employee of General Motors Acceptance Corporation ("GMAC") from 1990 until mid-2003.  As a GMAC employee,

---

[1]In its motion to affirm the administrator's decision, Met Life argues that ". . . Plaintiff's claims for benefits under the GM Program are exclusively federal and any state law claims and remedies are preempted by ERISA."  *See* Def.'s Mot. at 8.  Plaintiff does not disagree and, in fact, all of the arguments presented in her motion, response, and accompanying briefs are directed to whether she is entitled to PAI benefits under ERISA.

Mr. Lennon purchased a PAI policy issued by Met Life.  Under the PAI policy, benefits are payable to designated beneficiaries, subject to certain limitations.  The plan provides in relevant part:

> 4.12(j) Payment of Benefits
>
> If, While insured for Personal Accident Insurance, an Employee, spouse/partner or Dependent Child sustains *accidental* bodily injuries, and within one year thereafter shall have suffered loss of life or any other loss set forth in subsection (f), as a direct result of such bodily injuries independently of all other causes, the Carrier shall pay the benefit specified for such Losses.

(AR 111)(emphasis added.)  As relevant to this case, the plan also provides for the following exclusion:

> 4.12(h) Exclusions
>
> In no case shall payment be made for any loss which is contributed to or caused, wholly or partly, directly, or indirectly, by:
> . . .
> (5) suicide, attempted suicide or *self-inflicted injury* while sane or insane;

(AR 109-10)(emphasis added.)

Mr. Lennon died on June 4, 2003, after being involved in an automobile crash at approximately 2:30 a.m. on June 2, 2003.  At the time of the crash, Mr. Lennon was driving a 2003 Chevrolet Blazer on Woodward Avenue in Pontiac, Michigan.  (AR 228.) According to the police report, Mr. Lennon's vehicle came from the center median and hit the east curb, which caused the vehicle to go airborne and strike a brick wall

3

approximately 20 feet off the road.  (AR 229-30.)  The police report does not indicate

whether alcohol was involved in the crash.  (AR 228-31.)  The report does provide that

the officers did not smell intoxicants on Mr. Lennon or in his vehicle at the scene.  (AR

228, 230.)  The Medical Examiner's report, however, indicates that at the time of his

admission to the hospital, Mr. Lennon's Alcohol Plasma Level was 372 milligrams per

deciliter,[2] and that he was under the influence of alcohol at the time of the accident.  (AR

198.)  The Medical Examiner concluded, and the Certificate of Death reflects, that the

manner of death was an "accident" caused by "Blunt Force Head and Neck Trauma and

Complications."  (AR 177, 198.)

      After Mr. Lennon's death, Plaintiff, as the named beneficiary under the PAI

policy, filed a claim for benefits.  Met Life, relying on Mr. Lennon's blood alcohol level

at the time of the accident, denied Plaintiff's claim for PAI benefits, concluding that the

death was not accidental and that the impairments which led to the death were self-

inflicted.  (AR 183-84.)  As Met Life explained:

> The Toxicology Report states that Mr. Lennon's Blood
> Alcohol Concentration ("BAC") was .37% or more.  The
> Police Report indicates that Mr. Lennon lost control of the car
> he was driving while intoxicated and was dead at the scene.
>
> In Michigan it is unlawful to drive a vehicle while under the
> influence of alcohol when the person's alcohol concentration
> is .10% or more.  Further, Michigan law also provides that a

---

[2]Met Life explains that this translates into a blood alcohol content of .321 mg. of alcohol
per 100 ml. of blood, which is more than three times the legal limit in Michigan of .10 mg per
100 ml of blood.  *See* Def.'s Mot. at 1 & 4.

person is driving while impaired with a BAC of 0.8 or more.
This is because alcohol impairs the drinker's judgment and
physical and mental reactions.

Here, David's blood alcohol level was .37%, three times the
impairment level and thrice the lawful.  [sic]  The act of
driving while so impaired rendered the infliction of serious
injury of death reasonably foreseeable and, hence, not
accidental as contemplated by the GM plan.  Because of his
voluntary alcohol consumption and attempt to drive while so
impaired, David's death was [not][3] directly the result of
accidental injuries, independently of all other causes.  In
addition, the mental and physical impairments caused by the
voluntary consumption of alcohol consumption [sic]
constitute intentionally self-inflicted injuries under the GM
plan.

(*Id.*)  In its response to Plaintiff's request for review of the initial denial, Met Life once

again characterized the death as non-accidental, and concluded that the injuries leading to

death were caused by excessive consumption of alcohol, and were therefore self-inflicted.

(AR 159-60.)  After Met Life affirmed its earlier decision to deny PAI benefits, Plaintiff

commenced this action.

## <u>STANDARD OF REVIEW</u>

A district court reviewing a plan administrator's decision to deny benefits under an

ERISA-covered plan should apply a *de novo* standard of review "unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan."  *Firestone Tire and Rubber Co. v. Bruch*,

---

[3]In a subsequent letter to Plaintiff, Met Life acknowledged that its denial letter contained
typographical errors including the omission of "not" in this sentence.  (A.R. at 159 n. 1.)

5

489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989).  If discretionary authority is vested in the administrator, then the denial of benefits may only be reversed upon a showing that the decision was "arbitrary and capricious." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004).  The Sixth Circuit has recognized that for an insurer's decision on eligibility for benefits to be arbitrary and capricious, it must not have been "rational in light of the plan's provisions." *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991); *see also Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988).

In the present case, the delegation of discretionary authority is explicitly revealed in the text of the General Motors Life and Benefits Program for Salaried Employees, which provides in relevant part:

> 3.05(a) Administration and Amendment
>
> (1)     . . . In carrying out its responsibilities under the Program, the Carrier also shall have discretionary authority to interpret the terms of the Program and to determine eligibility for and entitlement to Program benefits in accordance with the terms of the Program.  Any interpretation or determination made by the Program Administrator or the Carrier, pursuant to such discretionary authority, shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(AR 30-31.)  Because the policy clearly grants Met Life discretionary authority to determine Plaintiff's eligibility for benefits, the appropriate level of review is the arbitrary and capricious standard.

6

## ANALYSIS

### Whether Met Life's Determination that Mr. Lennon's Death Was Not Accidental Was Arbitrary and Capricious

The PAI policy does not provide a definition for the term "accidental bodily injuries." The Sixth Circuit has not set forth a standard test for determining when an injury or death is accidental under the terms of an ERISA insurance policy.[4] However in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990), the First Circuit set forth a standard for determining whether an injury or death was accidental under the terms of an ERISA insurance policy which has been widely followed by district courts in the Sixth Circuit. *See, e.g., Harrell v. Metro. Life Ins. Co.*, 401 F. Supp. 2d 802, 811-12 (E.D. Mich. 2005); *Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010, 1012 (W.D. Mich. 1997); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F.

---

[4] In *Jones v. Metropolitan Life Insurance Co.*, the Sixth Circuit Court of Appeals, in reviewing an ERISA plan administrator's denial of benefits to an injured employee, recognized that there are competing interpretations of the term "accident." 385 F.3d 654, 664-65. As the court summarized:

> Some of these cases adhere to the accidental means versus accidental results distinction, but hold that an injury caused by an unintended and unexpected mishap during the course of an intentional activity is caused by an accident. Other cases reject the accidental means versus accidental results distinction and hold that an injury is accidental if it is neither subjectively expected nor objectively foreseeable.

*Id.* The *Jones* court found it unnecessary to adopt any particular test to decide the case before it, however, based on its finding that the plaintiff presented evidence passing either standard. *Id.*

7

Supp. 172, 175-76 (E.D. Mich. 1997); *Holsinger v. New England Mut. Ins. Co.*, 765 F.

Supp. 1279, 1281 (E.D. Mich. 1991).

In *Wickman,* the decedent fell 50 feet to his death after he was seen climbing over

a bridge guardrail and hanging onto the guardrail with one hand.  908 F.2d at 1080.  The

court, in finding that this death was not accidental under the terms of an accidental death

and dismemberment policy, applied a two-part test for determining whether an injury is

accidental under the terms of such a policy.  *Id.*  First, the fact-finder must evaluate "the

reasonable expectations of the insured when the policy was purchased" and determine

whether the insured "expect[ed] an injury similar in type or kind to that suffered."  *Id.* at

1088.  Next, if there is insufficient evidence to determine the insured's actual

expectations, "the fact finder should then engage in an objective analysis of the insured's

expectations . . . ask[ing] whether a reasonable person, with background and

characteristics similar to the insured, would have viewed the injury as *highly likely* to

occur as a result of the insured's intentional conduct."  *Id.* (emphasis added).

There is a split of authority as to whether death occurring when the insured is

driving while intoxicated is accidental.  Some courts have concluded that such deaths are

accidental.  For example, in *Harrell v. Metropolitan Life Insurance Co.*, the court applied

the *Wickman* test and concluded that, although the decedent was intoxicated when he was

killed in an automobile crash, the administrator was arbitrary and capricious in deeming

the death non-accidental.  401 F. Supp. 2d at 811.  The court reasoned that although death

may be reasonably foreseeable as a result of driving while intoxicated, there still was not

8

a "high likelihood" of dying as a result of driving while intoxicated, and concluded that

conduct which "increases the risk of dire results does not make those results inevitable."

*Id.* at 812.  In another ERISA case involving a fatal automobile accident in which the

decedent was intoxicated, the court applied the *Wickman* analysis and determined that a

reasonable person similarly situated to the insured would not have viewed the injury as

highly likely to have occurred.  *Eckelberry v. ReliaStar Life Ins. Co.*, 402 F. Supp. 2d 704

(S.D. W.Va. 2005).  *See also Metro. Life. Ins. Co. v. Potter*, 992 F. Supp 717, 730 (D.N.J.

1998)(applying *Wickman* in holding that the court cannot find as a matter of law that

death is highly likely to occur as a result of drunk driving).

Several courts have applied *Wickman* and found that injuries in the setting of

driving while intoxicated are not accidental.  *See Moore v. Metro. Life Ins. Co.*, No. 04-

73935, 2006 WL 286973 (E.D. Mich. 2006)(unpublished op.); *Cozzie v. Metro. Life Ins.

Co.*, 140 F.3d 1104 (7th Cir. 1998); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172

(E.D. Mich. 1997); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775 (E.D. Mich. 1997);

*Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010 (W.D. Mich. 1997);

*Cates v. Metro. Life Ins. Co.*, 14 F. Supp. 2d 1024 (E.D. Tenn. 1996); *Fowler v. Metro.

Life Ins. Co.*, 938 F. Supp. 476 (W.D. Tenn. 1996).  The courts in these cases concluded

that because injury and death are foreseeable consequences of driving while intoxicated,

they are not accidental.  For example, the court in *Fowler* explained that because "the

hazards of drinking and driving are widely known and widely publicized. . . . It is clearly

foreseeable that driving while intoxicated may result in death or bodily harm."  938 F.

9

Supp. at 480.  In *Miller*, the court relied on *Fowler* in determining that an administrator's determination that a fatal crash involving an intoxicated driver was not accidental was not arbitrary and capricious because of the public's knowledge of the "hazards of drinking and driving."  953 F. Supp. at 176.  Likewise, in *Moore*, the court concluded that an administrator's denial of a PAI claim was not arbitrary and capricious because the intoxicated decedent "should have foreseen the possibility of serious bodily injury or death . . . as a result of the dangerous operation of his vehicle while intoxicated."  2006 WL 286973 at *5.

The Court finds these cases unpersuasive.  First, although citing *Wickman* as a source of authority, the courts failed to properly adhere to the second prong of the *Wickman* test, which asks whether  "a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely* to occur as a result of the insured's intentional conduct."  908 F.2d at 1080 (emphasis added).  Instead, the courts focused on the "reasonable foreseeability" or "possibility" of death resulting from drunk driving.  Moreover, neither the courts, nor apparently the insurance companies in denying benefits, identified any evidence to support the conclusion that an intoxicated driver clearly should foresee death as a result of his or her conduct.

As Plaintiff correctly asserts, statistics actually show that a person "is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol related automobile crash, and far more likely to arrive home than to be either arrested,

10

injured, or killed." *West v. Aetna Life & Accident Ins. Co.*, 171 F. Supp. 2d 856, 904 (N.D. Iowa 1985); *see also Eckelberry*, 402 F. Supp. 2d at 712.  In *West,* the district court cited statistics compiled by the Federal Bureau of Investigation, which demonstrate that in the year 1996, while there were 1,033,000 nationwide arrests for drunk driving, there were less than 18,000 (i.e. 17,218) alcohol related traffic fatalities.  171 F. Supp. 2d at 903-04.  In other words, the statistics show that a drunk driver is sixty times more likely to be arrested than to die as a result of a traffic accident.  In fact, as the district court noted in *West*, "[w]hat 'common knowledge' should actually tell a person driving while intoxicated is that he or she is . . . far more likely to arrive home than to be either arrested, injured, or killed."  *Id.* at 904.

In *Eckleberry*, the district court relied on the following statistics:

> According to the National Highway Traffic Safety Administration, 17,419 persons died as a result of alcohol-related traffic deaths in 2002.  Although a high number, it is remarkably low when compared to the number of times a person impaired by alcohol got behind the wheel of a car during the same year.  The website operated by Mothers Against Drunk Driving states there were more than 159 million alcohol-impaired trips taken during 2002.  Based upon these numbers, one out of every 9,128 alcohol-impaired trips results in a crash that causes a fatality.  The court is unaware of any mathematical formula to calculate whether a result is reasonably foreseeable, but assumes that if a result has a 1-in-9,128 chance of occurring, it is not reasonably foreseeable.  Realizing that the number of alcohol-impaired trips taken is an estimate, assume that the number was overestimated by 100 million trips.  Even then, only one out of every 3,387 alcohol-impaired trips results in a fatality, a percentage still lower than the chances of being struck by lightning sometime during a person's lifetime.

11

402 F. Supp. 2d at 712 (internal footnotes omitted). As a result, although driving while intoxicated may cause death or injury, this does not necessarily mean that death or injury is a highly likely consequence– or even a reasonably foreseeable result– of driving while intoxicated.  While Plaintiff provides examples of case law presenting statistical evidence supporting the conclusion that death or injury is not a highly likely consequence of drunk driving, there is nothing in the Administrative Record, nor any evidence presented by Met Life in this action, contradicting this conclusion.[5]

Citing *Jones v. Metropolitan Life Insurance Co.,* Met Life argues that the Sixth Circuit only requires that it be objectively foreseeable that driving while intoxicated *could* result in a serious or fatal injury for an insured's death to be deemed non-accidental. The *Jones* court, however, summarizing the *Wickman* test, only refers to objective forseeability.  Nowhere in its opinion does the *Jones* court specify whether the foreseeability question is whether death *could* or *would* result.  385 F.3d at 664-65. *Wickman*, however, clearly considers "whether a reasonable person . . . would have viewed the injury as *highly likely* to occur as a result of the insured's intentional conduct."

---

[5]Met Life asserts that drunk driving includes the dangers of diminished capacity to think, function, or respond, as well as loss of balance, visual acuity and sleepiness, and concludes that these factors *may* cause a collision leading to injury or death.  Def.'s Mot. at 15.  Met Life also discusses media reminders which warn of the risks of drunk driving.  These assertions, however, do not address the issue of whether death or serious injury is a *highly likely* consequence of drunk driving.   Although Met Life argues that the media warnings should lead a reasonable person to believe that an accident is a "highly likely" result of drunk driving, it provides no evidence to support this conclusion.  The media awareness campaigns demonstrate a societal interest in preventing overall death and injury due to drunk driving, but do not address the odds of a particular drunk driver being involved in a serious accident on a given occasion.

908 F.2d at 1088 (emphasis added).  In other words, the relevant inquiry is not whether a reasonable person views death as a result of drunk driving as a possible consequence (i.e. *could* happen), but whether a reasonable person views death as a highly likely or inevitable consequence of drunk driving (i.e. *would* happen).

Having reviewed the case law discussed above, the Court concludes that Met Life acted in an arbitrary and capricious manner in concluding that Mr. Lennon's death was not an accident.  Met Life reached this conclusion based on its finding that "[t]he Police Report indicated that Mr. Lennon lost control of the car he was driving while intoxicated" and that because "alcohol impairs the drinker's judgment and physical and mental reactions . . . driving while so impaired rendered the infliction of serious injury of death reasonably foreseeable . . ."  (AR 183.)   First, the Police Report does not indicate that the collision resulted from Mr. Lennon's loss of control of his car due to any alcohol-induced impairment.  (AR 178-82.)  Second, there is no evidence supporting Met Life's assumption that death is a reasonably foreseeable consequence of driving while impaired. Met Life provides no evidence to suggest that Mr. Lennon intended to be involved in an automobile accident when he decide to drive while intoxicated, or that a reasonable person in his position would have viewed it as highly likely that he would become involved in, and die in, an automobile accident.  In comparison, Plaintiff cites case law providing evidence that a reasonable person in decedent's position would not have viewed death as a highly likely consequence of his conduct.  As a matter of fact, Plaintiff's evidence suggests that despite the increased risks associated with drunk

13

driving, a person in Mr. Lennon's situation would have viewed it as highly likely that he would return home safely on the night in question. There also is no evidence from which the Court or Met Life is able to evaluate Mr. Lennon's subjective expectations when he got behind the wheel of his car intoxicated. Met Life therefore acted in an arbitrary and capricious manner by relying solely on decedent's blood alcohol level to determine that his death was not an accident.

### Whether Met Life's Determination that Mr. Lennon's Death was a Result of Self-Inflicted Injury was Arbitrary and Capricious

As indicated previously, coverage for death resulting from a self-inflicted injury is excluded under Mr. Lennon's PAI policy. The PAI policy does not provide a definition for the term "self-inflicted injury." Met Life found that by driving while intoxicated, Mr. Lennon intentionally inflicted an injury upon himself which resulted in his death. Met Life argues that drinking alcohol is itself a form of self-inflicted injury, and cites case law to conclude that, even if the decedent did not subjectively intend to harm himself, he behaved in a way that was sufficiently risky to fall in the self-inflicted injury exclusion.

Inherently risky activities, however, do not necessarily fall within the self-inflicted injury exclusions under ERISA plans. For example, in *Critchlow v. First UNUM Life Insurance Co. of America*, 378 F.3d 246 (2d Cir. 2004), the court found that an insurer arbitrarily and capriciously relied on the self-inflicted injury exclusion to deny benefits to a beneficiary after the decedent died as a result of autoerotic asphyxiation. *Id.* The *Critchlow* court explained that although autoerotic asphyxiation is dangerous, the

14

participant did not intend to injure himself any more so than a participant in extreme
sports such as rock climbing, sky diving, or cliff rappelling.  *Id.* at 262-63.  As the court
noted, the plan language does not exclude activities that are simply hazardous and one
would not assume that a person engaged in dangerous activities intends to inflict injury–
let alone death– upon him or herself.  *Id*.

The Eighth Circuit Court of Appeals used similar reasoning in finding that an
insurance company arbitrarily and capriciously denied benefits when it determined that
the insured's drunk driving related death was excluded under a self-inflicted injury
exclusion.  *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994 (8th Cir. 2005)(en
banc).  The court reasoned that it would be unreasonable to interpret the exclusion for
self-inflicted injuries to include those injuries "that were unintended by the participant,
but which were contributed to by alcohol intoxication."  *Id.* at 1004.  As the  court
explained, "[o]ne rarely thinks of a drunk driver who arrives home safely as an 'injured'
party . . ." *Id*.

In order for risky behavior to be considered a self-inflicted injury, courts in this
district require that the decedent must have known that the risky behavior was likely to
cause his or her injury.  *See Harrell*, 401 F. Supp. 2d 802; *Holsinger v. New England*
*Mut. Life Ins. Co.*, 765 F. Supp. 1279 (E.D. Mich 1991).  In *Harrell*, the court adopted the
reasoning in *Critchlow* and *King* and held that, without any evidence in the record to
suggest that the deceased policy holder intended to inflict death upon herself by driving
drunk, the defendant's determination that the injury was self-inflicted was arbitrary and

15

capricious.  401 F. Supp. 2d at 810-11.  The court further noted that, in order to read the

self-inflicted injury exclusion as including risky behavior, the defendant had to read

additional requirements into the plan.[6]  *Id.* at 811; *see also Jones*, 385 F.3d at 661 (noting

that "[d]iscretion to interpret a plan . . . does not include the authority to add eligibility

requirements.")

Similarly in *Holsinger*, the insured policy holder died after intentionally ingesting

an excessive quantity of prescription drugs.  765 F. Supp. at 1280.  The court applied a

four factor test to determine whether the plan's self-inflicted injury exclusion applied:

> First, was the ingestion of drugs intentional?  Second, did the
> decedent know that the ingestion of drugs would be likely to
> cause an injury?  Third, did the ingestion of drugs cause an
> injury?  Fourth, did the loss result from the injury?

*Id.* at 1282.  The court upheld the insurance company's denial of benefits based on the

exclusion, concluding that "[i]t is beyond peradventure that the drugs did cause the injury

that decedent expected them to and that this injury ultimately contributed to his death."

*Id.* at 1281.

Met Life relies on several cases to assert that it did not act arbitrarily and

capriciously in applying the self-inflicted injury exclusion to Mr. Lennon's death.  *See*

Def.'s Mot. at 16; Def.'s Resp. at 8-9.  Met Life's reliance on some of these cases,

---

[6]As the court in *Harrell* noted, risky behavior such as drunk driving is not to be condoned
and insurance companies are not obliged to provide coverage for injuries arising from such
activities.  However, if insurance companies wish to exclude such coverage, they can do so by
including specific, unambiguous language in their policies.  Absent a specific exclusion or plan
language naturally or reasonably read to include such an exclusion, courts may not read such an
exclusion into a plan.

however, is misplaced, because they involved risky behaviors other than drunk driving and therefore do not provide convincing authority regarding the instant case. *Sims v. Monumental Gen. Life Ins. Co.*, 960 F.2d 478 (5th Cir. 1992)(death due to recreational restriction of blood flow); *Shepard v. Metro. Life Ins. Co.*, No. C-3-93-329, 1995 WL 1682316 (S.D. Ohio 1995)(death due to drug overdose); *Klei v. Metro. Life Ins. Co.*, No. 01-CV-76942-DT, 1992 WL 695749 (E.D. Mich. 1992)(death due to acute alcohol intoxication); *Holsinger*, 765 F. Supp. 1279 (death due to overdose of codeine); *Sigler v. Mut. Benefit Life Ins. Co.*, 506 F. Supp. 542 (S.D. Iowa 1981)(death due to autoerotic asphyxiation).  While Met Life does rely on several cases involving drunk-driving related deaths in which the courts found that the deaths were self-inflicted, the Court is not persuaded by the reasoning in those cases. *See* Def.'s Mot. at 16-17.

For example, in *Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010 (W.D. Mich. 1997), the court affirmed an insurer's determination that the decedent's drunk-driving related death fell under the self-inflicted injury exclusion. *Id.*  Relying on *Holsinger*, the court found "no dispute that the voluntary consumption of alcohol . . . would seriously impair [the decedent's] judgment and ability to control his vehicle" and that an ensuing fatal accident therefore constituted a self-inflicted injury. *Id.* at 1013.  In *Mullaney v. Aetna U.S. Healthcare,* 103 F. Supp. 2d 486, 495 (D.R.I. 2000), the district court relied upon *Nelson* and its application of the *Holsinger* test to conclude that the decedent's drunk-driving related death fell under his policy's self-inflicted injury exclusion.

17

In this Court's view, in applying *Holsinger*'s four part test, the *Nelson* court made an unsupported assumption that the decedent knew or should have known that death or serious injury would result from driving drunk.  The court reasoned that, although he may not have intended to die, the decedent's death was self-inflicted because he intentionally impaired his faculties by drinking alcohol and death was a foreseeable consequence of driving while drunk.  *Nelson*, 962 F. Supp. at 1013.  The court equated the decedent's drunk driving with an individual's engagement in Russian roulette.  *Id.*

However unlike the Russian roulette player who pulls the trigger of a gun pressed to his or her head, tempting the chance that a bullet is in the firing chamber, the drunk driver does not necessarily expect to die.   A person who holds a gun to his or her head and pulls the trigger intentionally chances death.  While a driver who consumes alcohol may intentionally impair his or her faculties, one cannot assume that the individual also intends to cause his or her death.  As discussed *supra*, statistical evidence does not even support the conclusion that death is an expected or highly likely outcome of such conduct.

The fact that drunk driving *may* or *could* result in injury or death does not mean that injury or death is *highly likely* to occur.  In the present case, Plaintiff provided evidence that death or injury is not a likely consequence of driving while intoxicated.  *See supra* at 9-11.  Met Life, in comparison, failed to respond with any evidence indicating that Mr. Lennon knew that driving drunk was likely to cause his demise, or that driving drunk is inherently risky enough to be considered a self-inflicted injury.  The Court,

therefore holds that Met Life acted in an arbitrary and capricious manner in determining

that Mr. Lennon's death fell under the PAI policy's intentional injury exclusion.

### Whether Met Life Violated ERISA, 29 U.S.C. § 1022(b), When it Failed to Provide Plaintiff with a Copy of the Summary Plan Description Upon Her Request

The Plaintiff, in Count III of her complaint, also requests that this Court award

penalties pursuant to 29 U.S.C. § 1022(b) for Met Life's alleged failure to timely provide

her with a copy of the summary plan description relative to Mr. Lennon's PAI policy.

Met Life seeks summary judgment with respect to this claim, asserting that upon

receiving Plaintiff's request on December 18, 2003 (AR 175-176), it provided Plaintiff

with copies of relevant portions of the plan description on December 30, 2003.  (AR 161.)

Met Life also argues that it is not the administrator of the plan, and therefore is not

subject to 29 U.S.C. § 1022(b).  Plaintiff has not responded to either argument.

Section 104(b)(4) of ERISA provides in relevant part that "the administrator shall,

upon written request of any participant or beneficiary, furnish a copy of the latest updated

summary plan description . . . ."   29 U.S.C. 1024(b)(4).  Further, section 502(c)(1)(B) of

ERISA provides in relevant part:

> Any administrator . . . who fails or refuses to comply with a
> request for any information which such administrator is
> required by this subchapter to furnish to a participant or
> beneficiary . . .within 30 days after such request may in the
> court's discretion be personally liable to such participant or
> beneficiary . . . .

29 U.S.C. § 1132(c)(1)(B).  The term "administrator" is defined in ERISA, section

3(16)(A) as:

19

(i) the person specifically so designed by the terms of the
instrument under which the plan is operated;
(ii) if an administrator is not so designated, the plan sponsor;
or
(iii) in the case of a plan for which an administrator is not
designated and a plan sponsor cannot be identified, such other
person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).

The General Motors Benefits Program, at Article II, Section 10, provides that
"Program Administrator means General Motors Corporation or its delegate."  (AR 21.)
Further, the summary plan description provides that "General Motors Corporation is the
sponsoring employer and administrator of the employee benefit plans described in this
booklet which are governed by ERISA."  (AR 168.)

Having reviewed the relevant portions of the General Motors Benefits Program,
and the summary plan description, and without any contrary evidence or argument offered
by Plaintiff, this Court concludes that Met Life is not the Plan Administrator for the
purposes of 29 U.S.C. § 1022(b).  Moreover, Plaintiff fails to present any evidence to
counter Met Life's proof that it in fact provided her with copies of the relevant portions of
the plan upon her request.  As a result, the Court finds that Defendant is entitled to
summary judgment with respect to Plaintiff's claim for penalties pursuant to 29 U.S.C. §
1022 (b).

## **CONCLUSION**

For the reasons set forth above, this Court finds that Met Life acted arbitrarily and

20

capriciously in denying Plaintiff's request for PAI benefits by determining that

decedent's death was not accidental and fell under the policy's self-inflicted injury

exclusion.  Further, this Court finds that Plaintiff has not provided evidence to support a

claim for penalties under 29 U.S.C. 1022(b).

Accordingly,

**IT IS ORDERED,** that Plaintiff's Motion to Reverse ERISA Plan Administrator's

Decision is **GRANTED;**

**IT IS FURTHER ORDERED,** that Defendant's Motion to Affirm the

Administrator's Decision or, in the Alternative, for Judgment on the Administrative

Record is **GRANTED IN PART AND DENIED IN PART**, in that Defendant's request

for summary judgment as to Plaintiff's claim for benefits is **DENIED**, but its request for

summary judgment as to Plaintiff's claim alleging a violation of 29 U.S.C. § 1022(b) is

**GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT

Copies to:
Edward G. Lennon, Esq.
David M. Davis, Esq.